## 11962. SANDERS v. THE STATE.

1. On a trial upon an indictment for murder, where the defendant's statement and the evidence tended to show, as one of the legitimate views thereof, that the families of the accused and the decedent were at enmity, that in a quarrel between the accused and his father on one side and the decedent and his companions on the other the decedent shot and wounded both the accused and his father, and that, although the decedent then ceased his assault, the accused ran to his home near by, armed himself with a pistol, returned to the scene of the assault, and, without additional cause or excuse, save the heat of passion engendered by the quarrel, shot and killed the decedent, the court did not err in giving in charge to the jury the law of voluntary manslaughter.

2. Without a mutual intent to fight, there can be no mutual combat; but that intent, like any other intent, may be manifested by the acts and conduct of the parties and the circumstances surrounding them at the time

of the combat, as well as the circumstances leading up to and culminating in such combat. The question of intent is peculiarly for the jury where there is any evidence from which it may be inferred. In the instant case the court did not err in referring that question to the jury, by giving them in charge the law applicable to mutual combat.

3. When considered in the light of the entire charge of the court and the facts of the case, none of the instructions complained of contain reversible error.

4. The evidence authorized the verdict, and it was not error to overrule the motion for a new trial.

DECIDED MARCH 9, 1921.

Conviction of manslaughter; from Putnam superior court — Judge Park. October 28, 1920.

*Stubbs & Duke,* for plaintiff in error.

*Doyle Campbell, solicitor-general, A. Y. Clement,* contra.

LUKE, J. Freddie Sanders was indicted jointly with his father, West Sanders, for the murder of John Adams, and, being separately tried, the son was found guilty of voluntary manslaughter. From the defendant's statement at the time and the conflicting evidence, the jury were authorized to find the following facts: On the day before the homicide West Sanders wrongfully killed a hog belonging to Adams, while Fred Sanders and his sister went to the Adams home, during his absence, assaulted and beat his wife, and forcibly took and carried away a pistol belonging to Adams. But later, either on the same day or at some time during the night, Adams and West Sanders mutually adjusted their differences by an agreement that Sanders should either pay for the hog he had killed or replace it with one of his own. On the occasion of the homicide Adams, with two companions, had started to the Sanders home to demand the return of his pistol, but met both West and Fred Sanders in the road near their home, where, in a discussion of the troubles of the preceding day, a quarrel ensued, which terminated in both West and Fred Sanders, who were then unarmed, being shot and wounded by Adams. As to what then followed, the defendant, in his statement to the court and jury, said: "I didn't have anything in my hand, and I ran to the house and got the pistol out of the washstand drawer, and come back and shot him and killed him." In a supplemental statement, made after the testimony was closed, the defendant further said: " I want to

finish telling you about what I done. I shot John to protect myself and my father, too. If I hadn't done something, he would likely have killed me and the whole family." But as to what John Adams, the deceased, was doing at the time the fatal shot was fired, or at any time after Fred Sanders left the scene of the first shooting to arm himself for the final combat, the evidence is conflicting and the defendant's statement is by no means clear. As to that interval of time the jury were authorized by some of the evidence, as well as by the defendant's statement, to infer that the deceased did nothing whatever to justify or mitigate the killing. From other evidence they were authorized to infer that the deceased merely held his ground, pistol in hand, awaiting the return of Fred Sanders, with the intention then and there to continue the fight; and that, upon the return of Fred Sanders, with his pistol in hand, the two men began simultaneously to shoot at each other, and continued to shoot until Adams fell mortally wounded.

Other theories of the case, deducible from the evidence, are unimportant here, the only attack upon the evidence being that it demanded either a conviction of murder or an absolute acquittal, and that it discloses no theory of voluntary manslaughter, either as where a killing occurs in a sudden heat of passion or as where the killing results from mutual combat.

1-3. Under the facts above outlined, a charge on the law of voluntary manslaughter was not only authorized, but was demanded. *Barney* v. *State, 5 Ga. App.* 301 (63 S. E. 28); *Smith* v. *State, 147 Ga.* 682 (95 S. E. 223). Even the defendant's statement, if true, shows no justification for the killing. The most that it does for him is to show a killing without malice and in a sudden heat of passion, provoked by the decedent's felonious assault upon the defendant and the defendant's father, thereby reducing the offense from murder to voluntary manslaughter. If the killing had occurred while the decedent was actually shooting at the defendant or at the defendant's father, or if it had occurred while the decedent was manifestly intending or endeavoring to shoot at either or both of them, then the killing would be justifiable homicide under the law of self-defense or under the right of a son to defend his father. Penal Code (1910), §§ 70 and 74. But justification cannot be based on a deadly

assault which has been completely ended, unless the assailant manifests some apparent purpose to renew or continue it. *Cochran* v. *State, 9 Ga. App.* 824 (72 S. E. 281). Where, as in this case, the assault had been completely ended, and the person assailed had left the scene of the assault, had gone into his own home, armed himself, and returned to the original scene before the killing occurred, the question is, not whether such killing was justifiable, but whether it was the result of a sudden heat of passion or of a deliberate desire for revenge. If it was the result of that sudden, violent impulse of passion supposed to be irresistible, then the killing was voluntary manslaughter; but if the interval between the assault and the homicide was sufficient for the voice of reason and humanity to be heard, then the killing should be attributed to deliberate revenge, and be punished as murder. Penal Code (1910), § 65. In so far as these principles of the law of homicide are concerned, the jury, in finding the accused guilty of voluntary manslaughter, simply accepted as true the version of the facts most favorable to him.

From the evidence above set out, a mutual intent to fight, and an actual fight in pursuance thereof, resulting in the homicide in question, were reasonably inferable. For this reason the court did not err in giving in charge to the jury the law applicable to such combats. But under this theory of the case. no more justification for the killing appears than under the other. To justify a killing in mutual combat, it must appear, not only that the threatened danger, whether real or apparent, was urgent and pressing " at the time of the killing, " but also " that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given. " Penal Code (1910), § 73. While, from this theory of the facts, the impending danger is sufficiently made to appear, yet in view of the defendant's own statement that he armed himself for that combat, left his place of safety to enter or recommence the affray, and, having entered it, remained in it until his antagonist fell mortally wounded, he negatives the other essential of the justification he claims.

The verdict was authorized by the evidence, and the charge of the court is not subject to the criticisms urged. The defend-

ant has had a fair trial. It was not error for any reason assigned to overrule the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*